665 F.2d 1126
 214 U.S.App.D.C. 308
 The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
ITT World Communications, Inc., Western Union International,
Inc., RCA Global Communications, Inc., Trans-Lux
Corporation, Intervenors (2 Cases).
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Graphnet, Inc., Trans-Lux Corporation, RCA Global
Communications, Inc., Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Trans-Lux Corporation, RCA Global Communications, Inc., Intervenors.
TRT TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
RCA Global Communications, Inc., Western Union Telegraph
Company, Western Union International, Inc., ITT
World Communications, Inc., Intervenors.
TRT TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
RCA Global Communications, Inc., Trans-Lux Corporation, Intervenors.
 Nos. 79-2494, 79-2496, 80-1196, 80-1240, 80-1276 and 80-1277.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 8, 1981.
Decided Sept. 3, 1981.
 
 Petitions for Review of an Order of the Federal Communications commission.
 H. Richard Juhnke, Washington, D. C., with whom Joel Yohalem, Harold L. Talisman, and James R. Schroll, Washington, D. C., were on the brief for petitioner, The W. U. Tel. Co., in Nos. 79-2494, 79-2496, 80-1196 and 80-1240.
 E. Edward Bruce, Washington, D. C., with whom Patrick M. Norton, Washington, D. C., was on the brief, for petitioner, TRT Telecommunications Corporation, in Nos. 80-1276 and 80-1277.
 William P. Mayer, Washington, D. C., entered an appearance for petitioner, TRT Telecommunications Corporation, in No. 80-1276.
 John E. Ingle, Deputy Associate Gen. Counsel, Washington, D. C., with whom Daniel M. Armstrong, Associate Gen. Counsel, Robert R. Bruce, Gen. Counsel, F. C. C. and Stanford M. Litvack, Asst. Atty. Gen., Robert B. Nicholson, Margaret G. Halpern, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents in Nos. 79-2494, 80-1276 and 80-1277.
 Robert E. Conn, New York City, was on the brief for intervenor, Western Union International, Inc., in Nos. 79-2494, 79-2496, 80-1276 and 80-1277.
 Jack Werner, Washington, D. C., entered an appearance for intervenor, The Western Union Telegraph Company, in No. 80-1276.
 Benjamin L. Zelenko, Washington, D. C., for intervenor, Trans-Lux Corporation, in Nos. 79-2494, 80-1277 and 80-1240.
 John A. Ligon, New York City, for intervenor, ITT World Communications, Inc., in Nos. 79-2496 and 80-1276.
 Robert R. Bruce, Washington, D. C., with whom Daniel M. Armstrong, Washington, D. C., was on the brief, for intervenors, ITT World Communications, Inc., Western Union International, Inc., RCA Global Communications, Inc., and Trans-Lux Corporation, in Nos. 79-2496 and 80-1240.
 Alan Y. Naftalin, Washington, D. C., for intervenor, RCA Global Communications, Inc., in No. 80-1276.
 Joel Yohalem, Washington, D. C., with whom Jack Werner and Harold L. Talisman, Washington, D. C., were on the brief, for intervenor, Western Union Telegraph Company, in Nos. 80-1276 and 80-1277.
 Edward P. Taptich, Washington, D. C., with whom Stanford B. Weinstein, Washington, D. C., was on the brief, for intervenor, Graphnet, Inc., in No. 80-1196.
 John J. Powers, III, Washington, D. C., with whom Margaret G. Halpern, Washington, D. C., was on the brief, for respondents in No. 80-1196.
 Robert B. Nicholson, Washington, D. C., with whom Nancy C. Garrison, Washington, D. C., was on the brief, for respondents in No. 80-1240.
 Alan Y. Naftalin, Washington, D. C., with whom Margot Smiley Humphrey, Washington, D. C., was on the brief, for intervenor, RCA Global Communications, Inc., in No. 80-1240.
 Before BAZELON, Senior Circuit Judge, TAMM and MIKVA, Circuit Judges.
 MIKVA, Circuit Judge:
 
 
 1
 Traditionally, the telegraph industry in this country has been divided into two segments. All transmissions between points within the United States have been handled by Western Union Telegraph Company (WUTC), the sole supplier of such services following the merger of WUTC and its major competitor in the 1940s. Messages between points in the United States and points abroad have been transmitted by "international record carriers" (IRCs).[1] These carriers have delivered international messages to, and picked them up from, five "gateway" cities within the United States. WUTC has transmitted these messages between the gateway cities and points within the United States (hereinafter "the hinterland").
 
 
 2
 In one of the two decisions at issue in this appeal, the FCC determined that additional competition between WUTC and the IRCs would be in the public interest and authorized the pickup and delivery of international messages by the IRCs at twenty-one new points of operation within the United States.[2] This authorization was, however, conditioned upon a structural modification to IRC rates and interconnection of their networks. These changes were found to be in the public interest in the other FCC decision on review in this appeal.[3]
 
 
 3
 WUTC challenges the expansion authorization, and one of the IRCs challenges the required rate change. WUTC argues that section 222 of the Communications Act of 1934, as amended, 47 U.S.C. § 222 (1976) (the Act), bars IRC operations in the hinterland and that the Commission erred in determining that such expansion would be in the public interest. TRT, the smallest domestic IRC, argues that the FCC acted unreasonably in mandating the rate change and, in addition, failed to follow the appropriate procedures. After reviewing the arguments of the parties, we find the decisions reasonable, consistent with the statute, and within the scope of the FCC's authority. We therefore affirm.
 
 I. BACKGROUND
 A. The Industry in Historical Perspective
 
 4
 A telegram is a one-way message delivered quickly between members of the public, who may or may not own telephones or teletypewriters. Such messages can be initiated, transmitted, and delivered in many ways, though delivery in written form is always an option. A customer may initiate a message by telephone, teletypewriter, or by going in person to a carrier's office. Similarly, a telegraph company may transmit between its offices by means of a radio transmitter, a telephone or telegraph line, a submarine cable, a microwave transmitter, or a satellite. The message may be delivered by telephone followed by an optional written confirmation sent by mail, teletypewriter, or messenger.
 
 
 5
 Prior to World War II, the telegraph industry was not broken into discrete domestic and international markets. The two major carriers of domestic telegrams were WUTC and Postal Telegraph and Cable Corporation (Postal), though WUTC served many foreign ports as well. And many domestic messages were transmitted on the radio-telegraph networks of the IRCs, carriers serving primarily the international market. During this period, the term "gateway" was used to refer to cities from which messages were transmitted directly to foreign points; its major significance was in ratemaking. See Oversight on International Telecommunications Policies: Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transportation, 95th Cong., 1st Sess. 132 (1977).
 
 
 6
 The structure of this industry was dramatically changed by two events. In 1942, as a security measure, the Board of War Communications[4] ordered the closure of all point-to-point radio-telegraph circuits[5] on the United States mainland.[6] Since the IRCs offering domestic services transmitted such messages via these circuits, they discontinued their domestic operations. This left only WUTC and Postal serving the domestic market. The second event took place in 1943 when Congress amended the Act to authorize the merger of WUTC and Postal.
 
 
 7
 By the early 1940s, Postal and WUTC were both in financial trouble, and Postal had already gone through one reorganization to prevent bankruptcy. Expanding telephone service was eroding the telegraph market, and WUTC and Postal were able to compete only by maintaining extensive duplicate facilities. With the support of the FCC, Congress created a statutory antitrust exemption in the form of section 222 of the Act, 47 U.S.C. § 222 (1976), which permitted WUTC to acquire Postal. Congress was understandably concerned that WUTC would utilize its new monopoly status to favor its own overseas facilities at the expense of its competitors, the IRCs. Section 222 therefore provided that, as a condition of any merger, the merged domestic carrier must divest itself of all international operations and must not thereafter transmit messages between points in the United States and points abroad.[7]
 
 
 8
 After the passage of section 222, Postal and WUTC merged pursuant to FCC authorization, and WUTC agreed to divest itself of its international operations. Thereafter, IRCs operated in the United States only in transmitting international messages between "gateway" cities and foreign countries.[8] Five cities were designated as gateways,[9] though not all IRCs were authorized to operate in all five locations.
 
 
 9
 Within the gateways, IRCs were allowed to service customers directly, but hinterland customers wishing to deal directly with an IRC were required to send messages to the IRC network at their own expense. This expense was in addition to the "postalized" country-to-country transmission charge, which did not depend on the precise location of the sending point in the country of origin or the destination point in the receiving country. Thus, a gateway customer paid only the postalized rate regardless of whether he gave his message directly to an IRC or used WUTC as an intermediary. A hinterland customer paid the postalized rate if he used WUTC to deliver the message to the IRC network in a gateway, but if he sent his message directly to the IRC, he paid, in addition to the postalized rate, the cost of contacting the IRC, presumably by telephone. Under this rate structure, when a customer, whether in the hinterland or the gateway, initiated his message with WUTC, WUTC received part of the postalized rate.
 
 B. The Industry Today
 
 10
 Prior to the FCC's recent decisions, the market division of the 1940s remained unchanged. IRCs operated only in "gateway" cities, and WUTC was the only carrier authorized to transmit messages within the United States. The market itself had, however, undergone profound changes. Telegraph usage had declined even further for many reasons. The costs associated with providing public offices and messenger service had risen, and other services, such as the telephone, had become cheaper and more attractive. In addition, new modes of communication were used in place of telegrams: specialized carriers offered a variety of services using innovations such as microwave transmitters and satellites to communicate not just words, but many types of data in complex forms. Businesses no longer used telegrams for the transmission of routine commercial messages; instead they used "telex," a two-way form of written communication between teletypewriters. Mailgram and other new, cheaper, telegraph-like services also diverted what would have been telegraph traffic.
 
 
 11
 By the 1970s, telegraph companies themselves also had changed. They no longer picked up and delivered only telegrams (one-way messages in a particular format), they also provided new services, including the telex service described above. New services were, however, offered in accord with the market division of the 1940s: IRCs offered telex service only in the gateway cities, and WUTC offered telex service throughout the United States. Indeed, after its acquisition of TWX, a form of telex,[10] from AT&T in the early 1970s, WUTC was virtually the sole provider of telex service in the hinterland.
 
 
 12
 The FCC never made a policy determination in favor of a domestic telex monopoly; WUTC's acquisition of TWX was approved only because the FCC thought new entrants would provide similar services in competition with WUTC. See Western Union Tel. Co., 24 F.C.C.2d 664 (1970). Although the FCC subsequently authorized the provision of specialized data transmission services by other carriers, see, e. g., Specialized Common Carriers, 29 F.C.C.2d 870 (1971), none of these services precisely duplicates telex, and WUTC, with its extensive network, continues to dominate the domestic telex market. See Policy and Rules Concerning Competitive Common Carrier Services, No. 70-252, Order No. 80-629 P 70 (Nov. 28, 1980) (first report and order); FCC News, No. 79-252, Rep. No. 16,104 (Dec. 16, 1980) (reprinted as Appendix A of Brief of Intervenor WUI).
 
 
 13
 There were several differences between the telex service available from WUTC and that offered by the IRCs. A customer in the hinterland had always been able to send an international telegram by contacting an IRC directly, though at his own expense. Similarly, a customer in the hinterland could send an international telex message by transmitting it to the IRC's network in a gateway city at his own expense. Despite this additional charge, many hinterland customers did contact IRCs directly rather than use WUTC as an intermediary.[11]
 
 
 14
 A second difference was that IRC customers, unlike WUTC customers, could not always reach every part of the world. Not all IRCs operated in every foreign port, and, although WUTC was interconnected with all IRCs, not all IRCs were interconnected with each other.
 
 
 15
 Another difference was that the IRCs were permitted to charge a "bundled" rate for telex service to gateway customers: these customers were charged by the transmission minute with at most a nominal charge for the terminal and the access line,[12] a line leased from a telephone company and providing direct access between a customer's terminal and the IRC network. WUTC was not, however, authorized to offer "bundled" rates and offered a charge for transmission separate from any charge for terminal or access line.
 
 
 16
 These bundled rates hid from WUTC's customers in the gateways the actual cost of receiving direct service from an IRC in addition to service from WUTC. All things being equal, customers prefer to send messages via a carrier providing direct service to a destination; direct transmissions are faster and the connection is better. But the price for the ability to transmit directly is a terminal and access line linking the customer to the carrier; a single terminal can provide direct access to only one carrier. If this cost were imposed directly, a WUTC customer would not acquire a second terminal and access line unless he sent enough international messages to justify the additional expense in terms of time and money saved.
 
 
 17
 Under bundled rates, carriers were able to conceal this additional cost from gateway customers. Indeed, the WUTC customer in a gateway paid precisely the same charge per transmission minute regardless of whether he sent his message via WUTC or an IRC,[13] but if he used an IRC, that rate included a second terminal and the local access line.[14] In contrast, IRC rates were not bundled in the hinterland; there customers were required to pay for both their own terminal and the access line to the IRC network in a gateway city.
 
 
 18
 Bundled rates may also have made it easier for small IRCs, unable to provide direct service to all areas of the world, to compete with the large IRCs.[15] According to TRT, it obtains a substantial portion of its business in the gateway cities by providing services to customers of the large IRCs.[16] The only real benefit TRT is able to offer these customers is direct service to areas also served by the large IRC-the customer is able to use TRT's line when those of the large IRC are busy. This benefit is of such marginal value, TRT asserts, that these customers would not use TRT if they had to pay directly the additional cost of another terminal and access line to TRT's network.
 
 
 19
 Thus, by the 1970s, the structure of the telex-telegraph industry in this country was rather convoluted. WUTC had a monopoly on domestic transmission of both types of messages. The domestic telegram monopoly had been deliberately given to WUTC during the 1940s in order to preserve the economic viability of that industry, though, as will be seen below, WUTC now maintains that the industry can be preserved only by permanent subsidies from healthier industries. WUTC's telex monopoly had happened inadvertently. The IRCs shared a "monopoly" in the transmission of messages to points abroad. These carriers were allowed to serve gateway customers directly, but hinterland customers contacted them at their own expense, an expense that would have been avoided if WUTC had been used as an intermediary. IRCs were able to offer the advantage of direct access to foreign ports and could hide the additional cost of such access from WUTC customers in gateways, though not from hinterland customers. In the early 1970s, the FCC decided to review the regulatory environment that had produced this strange and certainly unplanned market structure.
 
 
 20
 C. The FCC Reexamines the Regulatory Environment: The Decisions Below
 
 
 21
 In 1971, RCA, one of the large IRCs,[17] applied to the FCC for authorization to operate in fifteen additional gateways. This application was followed by others until all five IRCs had requested authorization for, in varying combinations, a total of twenty-one new gateway cities. The Commission included these applications in a general inquiry into the international written-message transmission industry. Much of this investigation focused on the impact such expansion would have on WUTC.
 
 
 22
 The two FCC decisions at issue in this appeal are the product of this investigation. In International Record Carriers' Scope of Operations in the Continental United States, 76 F.C.C.2d 115 (1980), (hereinafter "Gateways"), the Commission did not increase the number of gateway cities. Instead, the FCC authorized pickup and delivery of international messages by the IRCs in twenty-one new "domestic points of operations," without designating these cities as "gateways."[18]
 
 
 23
 Two conditions were, however, imposed on this expansion: an IRC could expand only if it filed unbundled rates and was willing to connect its network with that of any other IRC requesting interconnection. These changes were found to be in the public interest in the second decision on review here, Interface of the International Telex Service with the Domestic Telex and TWX Services, 76 F.C.C.2d 61 (1980) (hereinafter "Unbundling ").
 
 
 24
 From these decisions, WUTC and TRT, the smallest domestic IRC, appeal. WUTC argues that the expansion authorization was erroneous because the Communications Act bars IRC hinterland operations. In addition, WUTC raises a variety of objections to the FCC's determination that the public interest will be served by such expansion. TRT maintains that the FCC erred in finding unbundled rates desirable. TRT objects both to the Unbundling decision and to the Gateways decision to the extent that the latter conditions expansion on unbundled rates. In addition, TRT alleges that the Unbundling decision is flawed by several procedural errors. We will first discuss whether WUTC is correct in arguing that the Communications Act bars hinterland operations by the IRCs. We will then consider WUTC's other objections to Gateways and TRT's objections to Unbundling.
 
 
 25
 II. THE COMMUNICATIONS ACT AND IRC HINTERLAND OPERATIONS
 
 
 26
 WUTC argues the FCC erred in changing its interpretation of section 222, the provision enacted to allow WUTC to acquire Postal during the 1940s. In Gateways, the FCC overruled its prior interpretation of section 222 and held that it does not bar hinterland operations by the IRCs.
 
 
 27
 Under this statute, the FCC may approve the merger of domestic telegraph carriers without regard to the antitrust laws, but, as a condition of any such merger, the consolidated or merged carrier must divest itself of all international operations. See Act § 222(c)(2), 47 U.S.C. § 222(c)(2) (1976). International transmissions are defined as all transmissions between gateways and foreign ports; neither the domestic carriage of international messages to or from a gateway, nor the domestic carriage of international messages originating and terminating outside the United States, but passing through the United States, is included in this definition. Thus, as a condition of its merger with Postal, WUTC was required to divest itself only of those facilities transmitting messages between points in the United States and points abroad. ITT was allowed to continue to transmit the "land-line haul" of international messages regardless of whether the messages began, or ended, or both, at points outside the United States.
 
 
 28
 WUTC argues that, as an integral part of this scheme, IRCs can transmit messages only between "gateway" cities and points abroad. To support this argument, WUTC points to a proviso included in the definitional portion of section 222, the legislative history of that statute, and its prior interpretation by the FCC and members of the industry. It is true that, for an intermediate period of time, long after the statute's enactment and prior to the decisions below, the FCC assumed that section 222 barred the land-line haul of even international messages by IRCs. With this exception, however, the sources cited by WUTC do not support its position. Instead, they indicate that divestment of international operations by WUTC was the quid pro quo for WUTC's merger with Postal, regardless of where IRCs are authorized to operate.
 
 A. The Statute
 
 29
 As WUTC recognizes, section 222 does not contain any language explicitly limiting the domestic operations of the IRCs. WUTC argues, however, that an eight-line "proviso" appearing at the end of the definition of "domestic telegraph operations" in section 222(a)(5) implicitly bars such operations.
 
 
 30
 Section 222(a)(5) contains a rather peculiar and extremely broad definition of domestic telegraph operations. Under the statute, "domestic operations" include the transmission of all messages beginning, ending, or passing through, the United States:
 
 
 31
 The term "domestic telegraph operations" includes acceptance, transmission, reception and delivery of record communications ... which either originate or terminate at points within the continental United States, Alaska, Canada, Saint Pierre-Miquelon, Mexico or Newfoundland ... (and) includes acceptance, transmission, reception, or delivery performed within the continental United States between points of origin within the points of exit from, and between points of entry into and points of destination within, the continental United States ... which either originate or terminate outside the continental United States, Alaska (and other North American points) ....
 
 
 32
 Act § 222(a)(5), 47 U.S.C. § 222(a)(5) (1976).[19] Immediately after this definition of "domestic operations," the "proviso" appears:
 
 
 33
 Provided, That nothing in this section shall prevent international telegraph carriers from accepting and delivering international telegraph messages in the cities which constitute gateways approved by the Commission as points of entrance into or exit from the continental United States, under regulations prescribed by the Commission, and the incidental transmission, or reception of the same over its (sic ) own or leased lines or circuits within the continental United States.
 
 Id.[20]
 
 34
 Thus, section 222(a)(5) consists of two parts: an all-inclusive definition of domestic operations and a cautionary proviso. The proviso does not expressly limit the operations of IRCs. Its language is permissive: "nothing in this section shall prevent." The proviso does not state that international telegraph carriers shall not engage in domestic operations except in gateways approved by the Commission. Nor does it provide that IRCs must divest themselves of domestic operations. It simply says that nothing in section 222 prevents international telegraph carriers from picking up and delivering telegraph messages within the gateways approved by the Commission.
 
 
 35
 This interpretation, based on the plain language of the statute, is supported by the Act's structure and by the quite different way in which the future international operations of a merged domestic carrier are restricted. Section 222(a) is the first section of the Act and only definitional: it begins with the words "(a)s used in this section," and it then contains only definitional subsections. One would not, therefore, expect a substantive limit in any part of section 222(a).
 
 
 36
 Moreover, in sharp contrast to the language of the proviso, the limit on future international operations by a merged domestic carrier is explicit, unambiguous, and effective only in the event a merger actually takes place: "Any proposed consolidation or merger of domestic telegraph carriers shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger." See Act § 222(c)(2), 47 U.S.C. § 222(c)(2) (1976). Not only is this language, unlike that of the proviso, clearly restrictive, but the limit is effective only after a merger. In the absence of a merger, WUTC and Postal could have continued, or even expanded, their international operations. In contrast, the proviso has no effective "date," and under WUTC's interpretation, the IRCs apparently would be barred from the domestic market even if no merger had ever taken place and if, instead, WUTC had expanded its international operations.
 
 
 37
 WUTC argues that this proviso may not be regarded as a mere clarification to the preceding definition. Under WUTC's analysis, the proviso itself is a substantive limitation since WUTC points to no other passage of section 222 limiting or restricting IRC activities. Nor does it point to anything in the legislative history suggesting that some other part of the statute was intended to impose a limit on IRC activities. WUTC insists, however, that this result is compelled by the maxim that a statute should be construed so as to give effect to all of its parts, since viewing the proviso as a clarification renders it unnecessary. This maxim does not, however, override the primary rule of statutory construction: a statute's plain meaning should be given priority in its construction.[21] It would be strange indeed to hold that Congress cannot use a cautionary proviso to clarify a point without enacting as substantive law any negative pregnant hidden, but implicit, in the clarifying language.
 
 
 38
 Moreover, it seems likely that the intended effect of the proviso was to clarify the limited impact of the rather expansive definition of domestic operations which immediately precedes it. For some reason not immediately apparent,[22] the definition of domestic operations is all-inclusive and covers international operations: section 222(a)(5) defines domestic operations as the transmission of any message beginning, ending, or passing through the United States, and section 222(a)(6) defines international operations as the transmission of any message between points in the United States and points abroad. Under these definitions, international operations are merely a subset of domestic operations.[23] Congress may have added the proviso merely to clarify that the definition of "domestic operations" was not meant to imply that IRCs could be prohibited from transmitting messages between gateways and points abroad. It is true that such a proviso was not absolutely necessary, but clarifying language is never absolutely necessary, and this interpretation, based on the plain meaning of the statutory language, is also supported by the statute's legislative history: Congress recognized that the proviso might be regarded as unnecessary, but included it to clarify what would have been the law in any event.
 
 B. The Legislative History
 1. The Origins of Section 222
 
 39
 The telegraph merger legislation which eventually took the form of section 222 was a response to severe institutional problems confronting the telegraph industry, chiefly the domestic side, during the 1930s. WUTC, the principal domestic telegraph carrier, was profitable, but its revenues and services had suffered from the effects of the Great Depression and from increasing competition created by the voice and record (written) services of the Bell System, air mail, and the development of radio telegraphy by carriers such as RCA. See S.Rep.No. 769, 77th Cong., 1st Sess. 17-19 (1941). The other major domestic wireline telegraph carrier, Postal, was in extremis. Id. at 20.[24] On the international side, the problems were political. Then, as now, the several American IRCs had to deal, in many foreign countries, with a single government-owned carrier. There was some thought that a single American "chosen instrument" could more effectively serve this nation's interest in such matters. Id. at 21-22.
 
 
 40
 In hearings held in May of 1941, FCC Chairman Fly recommended the merger of the domestic carriers and a separate merger, into a single entity, of the international carriers. Id. at 5.[25] The concept of an international merger was, however, opposed by some Commissioners and by the Army and Navy. Id. at 6. At the end of the hearings, the Committee concluded that the Congress should consider legislation which would authorize the mergers of both domestic and international record carriers, but not one with the other. Id. at 25.
 
 2. The Bills of 1942
 
 41
 In April of 1942, Senator McFarland of Arizona and Senator White of Maine introduced a bill, S. 2445, to "amend the Communications Act ... to permit consolidations or mergers of telegraph operations and for other purposes." S. 2445, 77th Cong., 2d Sess. (1942). In line with the Committee's 1941 recommendations, the bill authorized the voluntary merger of domestic telegraph carriers with other domestic telegraph carriers, and of international carriers with other international carriers, but not of domestics with internationals. As a condition of merger, divestment was required: if domestic carriers merged, they had to divest their international operations, and if international carriers merged, they had to divest their domestic operations.[26]
 
 
 42
 The bill was referred to the Senate's Interstate Commerce Committee, where extensive hearings were held. Because of strong opposition to the international merger authorization, the Committee scrapped S. 2445 and reported a new bill, S. 2598. Although the paragraphs in this bill are ordered differently, it is identical, for all material purposes, to the legislation ultimately enacted.[27]
 
 
 43
 In reporting the bill to the full Senate, the Committee's report stated:
 
 
 44
 (T)he committee calls attention to the fact that there will be no monopoly in the domestic communications field if carriers merge under the provisions of this bill. The prospective merged domestic carrier would face, as its component units now face, sharp and effective competition from such widely used means of communications as the telephone, the air mail, and point-to-point radio (which has been temporarily closed for the period of the war ). It is the competition from these alternate means of communication which has taken large revenues from the domestic commercial wire-telegraph units during the last decade .... The bill, S. 2598, makes sure that healthy competition will remain in the domestic communications field.
 
 
 45
 S.Rep.No. 1490, 77th Cong., 2d Sess. 2 (1942) (emphasis added).
 
 
 46
 The report's reference is to the domestic operations of radio carriers such as TRT, RCA, and Mackay Radio; as a security measure, the Board of War Communications had ordered the closure of these operations shortly before the report issued.[28] Prior to that order, RCA and MacKay Radio provided domestic telegraph service in competition with the wire-line facilities of WUTC. Mackay Radio had a sixteen-city domestic network of radio telegraph operations. RCA provided radio telegraph service to twelve cities. Thus, the quoted portion of the Committee report indicates that, despite the wartime closure of the "international" carriers' domestic operations, congressional consideration of the proposed telegraph merger legislation proceeded on the assumption that such operations would be reactivated.
 
 
 47
 The report also included the conventional section-by-section analysis. With respect to the bill's definitions, which WUTC reads as mandating major changes in the structure of the industry, the report stated only that the definitional subsection, now section 222(a), "defines the terms used in the bill." Id. at 10.
 
 
 48
 The Senate passed this bill and sent it to the House, where it was referred to that chamber's Committee on Interstate and Foreign Commerce. After hearings, the House Committee reported a different bill.[29] Unlike the Senate bill, the House bill provided for merger of international as well as domestic carriers and did not mandate any divestiture of international operations by a merged domestic carrier, although divestiture of domestic operations was required of a merged international carrier. See H.R.Rep.No.2664, 77th Cong., 2d Sess. 2 (1942). This bill was not reported until late November, however, and Congress adjourned without any action by the full House.
 
 3. The Legislation of 1943
 
 49
 When the Seventy-Eight Congress convened in January, 1943, Senators McFarland and White promptly reintroduced the Senate's version of S. 2598, this time styled S. 158. The measure was referred to the Interstate Commerce Committee and was quickly reported without further hearings in S.Rep.No.13, 78th Cong., 1st Sess. (1943), which merely repeated the report that had accompanied S. 2598 in the previous session. The repeated material included, of course, the Committee's assurance, quoted above, that a merger of domestic carriers would not eliminate competition.
 
 
 50
 The Senate again passed the bill and referred it to the House. Without additional hearings, the latter's Committee on Interstate and Foreign Commerce again reported a new House version. See H.R.Rep.No.69, 78th Cong., 1st Sess. (1943).[30] Although this bill did not provide for the merger of international carriers, it did continue to differ from the Senate bill in not requiring divestment of international operations by a merged domestic carrier. Id. at 2. In addition, the House Committee eliminated the "gateway proviso" from the definition of "domestic telegraph operations" in the Senate bill because it was seen as unnecessary. The bill contained no divestiture requirement of any kind for any carrier, nor any provision preventing international companies from carrying on the operations referred to in the proviso. Id. at 6.[31]
 
 
 51
 The House passed its Committee's proposal, and conferees from the two chambers agreed on the final version. The conference restored both the divestiture requirement for merged domestic carriers and the "gateway proviso" at the end of the definition of domestic telegraph operations. The House managers explained that the proviso was included for purposes of clarification.[32] The Senate managers issued no formal report, but Senator McFarland, when presenting the conference bill on the floor of his chamber, also explained that the proviso was included for the sake of clarity.[33]
 
 
 52
 Thus, the legislative history demonstrates that section 222 does not bar any kind of IRC operations in the hinterland, let alone the operations authorized by the FCC in Gateways : the pickup and delivery of international messages. Divestment of international operations by WUTC was the price of its exemption from the anti-trust laws for the Postal merger. Divestment by the IRCs of domestic operations-that is, facilities transmitting communications wholly within the United States, but not the pickup and delivery of international messages-presumably would have been the price of any authorization for their merger, had Congress chosen to give it. Although this interpretation differs from the FCC's most recent construction of the statute, it is consistent with the initial understanding of its meaning by the FCC and members of the industry.
 
 C. Prior Interpretations
 
 53
 As the Commission recounts in Gateways, following the adoption of section 222, the Chairman of the FCC, James Fly, who also served as the ex officio Chairman of the Defense Communications Board, stated that the Board could authorize resumption of purely domestic telegraph service by the IRCs. See Gateways, 76 F.C.C.2d at 129. In responding to RCA's inquiry as to when the 1942 suspension order might be lifted, Chairman Fly replied that a special study was being made regarding the advisability of relaxing the wartime ban. Two months later, RCA was informed by Chairman Fly's successor, E. K. Jett, that "(o)n the basis of the studies" and objections of the Office of Censorship, modification of the Board's order "prior to the ultimate defeat of both Germany and Japan, would (not) be consistent with good communications security."[34] Had section 222 posed a bar to resumption of RCA's domestic operations, Chairmen Fly and Jett, who were intimately familiar with the legislation, presumably would have said so and would have seen no need for elaborate security studies.
 
 
 54
 Following the war, neither RCA nor the other "international" carriers were permitted to revive their domestic radio-telegraph operations. The ban had nothing to do with section 222, but resulted from the FCC's decision to reallocate the domestic frequencies at issue to meet the increasing demand for international, aeronautical, maritime, and emergency services. See Press Wireless, Inc., 11 F.C.C. 633, 636-38 (1946).[35] And on more than one occasion, the Commission indicated that "international" carriers were free to pick up and deliver international traffic in cities other than the so-called traditional gateways by means other than radio. See Press Wireless, Inc., 21 F.C.C.2d 311, 317 (1956); All American Cables & Radio, Inc., 15 F.C.C. 293, 317 (1950); Press Wireless, Inc., 11 F.C.C. 633, 636-38 (1946).
 
 
 55
 Although the FCC has assumed, in recent years, that IRC hinterland operations are barred by section 222,[36] that assumption does not necessarily make its current decisions wrong. In the decision on appeal, the FCC fully appreciated that it was changing its interpretation and did so only after thorough analysis of the statute and its legislative history. See Gateways, 76 F.C.C.2d at 128-35. In such circumstances, even a novel agency interpretation is entitled to deference. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 60 S.Ct. 161, 89 L.Ed. 124 (1944). Having determined that hinterland operations by the IRCs are not barred by the Communications Act, we turn to WUTC's other objections to the FCC's expansion authorization.
 
 
 56
 III. THE PUBLIC INTEREST AND THE Gateways DECISION
 
 
 57
 WUTC argues that the Commission's Gateways decision does not reflect a reasonable determination that expanded IRC domestic operations will be in the public interest.[37] As WUTC points out, the Commission "cannot merely assert the benefits of competition in an abstract, sterile way" when authorizing an additional provider of a service. Hawaiian Telephone Co. v. FCC, 498 F.2d 771, 776 (D.C.Cir.1974) (footnote omitted). In FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), the Supreme Court remanded a case to the Commission because it had authorized the entry of a competing carrier on the basis of the naked assumption that, as a matter of national policy, competition was to be fostered if reasonably feasible. As the Court noted, Congress has delegated to the Commission the responsibility for determining when competition is in the public interest in the area under its jurisdiction, and the Commission may not simply assume that such is the case. Id. at 95-97, 73 S.Ct. at 1004-1005.
 
 
 58
 In addition, as this court noted in Hawaiian Telephone, 498 F.2d at 777 (quoting RCA Communications, 346 U.S. at 96-97, 73 S.Ct. at 1005) (adding emphasis), "(w)hile the Commission need not make 'specific finding of tangible benefit' it must go beyond its bare assertion of benefit. It must provide the basic facts which lead it to reach its conclusion of public benefit from the decision." In order to uphold the decision of the FCC in the case at bar, we must, therefore, be able to find that the FCC reasonably determined, with an adequate factual basis, that competition would serve the public interest.
 
 
 59
 WUTC raises two basic objections to the FCC's public-interest determination. First, WUTC notes that it had the capacity to handle the land-line haul of all international messages and argues that the FCC had no basis for concluding that authorizing additional providers of this service would be in the public interest. Second, WUTC maintains that the FCC acted unreasonably in concluding that competition between the IRCs and WUTC would be feasible. We reject each of these arguments.
 
 A. Additional Providers of Service
 
 60
 The fact that a service is already available from another carrier does not in itself suggest that the Commission acts unreasonably when it authorizes a second provider. See Washington Utilities & Transportation Comm'n v. FCC, 513 F.2d 1142, 1157 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) ("(S)tatutory language does not suggest that the Commission is to give controlling weight to the mere fact that existing common carriers have the ability to perform the service the applicant wishes to furnish."). In Gateways, the FCC determined that, despite the availability of the service from WUTC, competition from the IRCs would provide benefits. First, the FCC noted that direct customer contact with the IRCs would eliminate waste and inefficiency which the record indicated were attributable to the need to go through an additional network. Second, the Commission relied on an earlier determination, made in Domestic Public Message Services, 71 F.C.C.2d 471 (1979) (hereinafter "PMS "), that competition should be encouraged in order to revitalize the industry and maximize innovation. WUTC argues that neither of these reasons provides an adequate basis for the FCC's authorization of additional providers.
 
 1. Delays and Inefficiencies
 
 61
 According to WUTC, the FCC concluded that allowing customers to deal directly with IRCs would eliminate delays and inefficiencies only because it relied exclusively on RCA's self-serving contentions and ignored the objective evidence of a disinterested party, the British Post Office, indicating that the service quality on WUTC's system is as good as or better than that on the IRCs' systems.
 
 
 62
 We find the position of WUTC, not that of the Commission, unsupported by the record. Even WUTC's evidence to the Commission indicated that customers dealing directly with RCA, rather than WUTC, were able to place their calls in an average of 15.5 seconds less per call. See Petition to Deny and Comments of WUTC at 69 (Jan. 8, 1979) (filed before FCC in Gateways ), reprinted in Joint Appendix (J.A.) at 250, 321. The evidence of the disinterested observer, the British Post Office, which WUTC says the FCC improperly ignored, was not to the contrary; the British Post Office data showed only that WUTC's customers are able to complete as many of their attempted calls as are customers of RCA and WUI. See id. at 67, J.A. at 319. This hardly indicates that WUTC is able to serve customers as efficiently or quickly as the IRCs.[38]
 
 
 63
 It should be noted that approximately 50,000 messages a month are sent directly to the IRCs by hinterland customers at their own expense-an expense they would not incur if they used WUTC as an intermediary. If WUTC is right, and customers will not benefit from dealing with IRCs directly, these users are deliberately paying higher rates for equivalent service.
 
 
 64
 On this record, we think the FCC quite reasonably concluded that it would be in the public interest to allow "customers of international record services to interface directly with the IRCs, eliminating any delays and inefficiencies which the record indicates may result from reliance on Western Union." Gateways, 76 F.C.C.2d at 137. Indeed, it might well have been unreasonable to come to any other conclusion.
 
 2. The PMS Decision
 
 65
 WUTC maintains that the Domestic Public Message Services (PMS) decision is an inadequate basis for authorizing additional providers for two reasons: it contains no exhaustive city-by-city and carrier-by-carrier analysis, and its analysis is irrelevant to the expansion authorized by Gateways. According to WUTC, PMS analyzed a different market: PMS rather than telex.[39] We will first consider the latter point-whether the PMS analysis is even relevant to the use to which it is put in Gateways-and then consider whether it provides reasonable support for the Gateways decision.
 
 
 66
 a. The Relevance of the PMS Decision
 
 
 67
 PMS, or public message service, has traditionally been a synonym for telegram or telegraph service-"record" (written) transmission of one-way messages available to all members of the public regardless of what kind of equipment they own. Although many PMS messages are delivered or initiated by special equipment, usually telephones, teletypewriters, or other kinds of terminals, the traditional definition of "PMS" does not include telex messages, which are sent in telex, rather than telegram, format from one teletypewriter to another. WUTC maintains that the FCC's determination in PMS regarding the need for competition covered only the narrow, traditional PMS market and did not encompass the telex market. Because the Gateways decision authorized expanded IRC telex service, as well as PMS, WUTC maintains that the market analysis in PMS cannot support the result in Gateways.
 
 
 68
 Although the FCC has, in the past, defined PMS in the way in which WUTC uses it in this argument,[40] it did not do so in PMS. Indeed, in that decision, the FCC explicitly declined to adopt any rigid definition of PMS. See PMS, 71 F.C.C.2d at 505 ("We will not attempt to define precisely the contours of public message service here ...."). This was not an arbitrary refusal to undertake a difficult task; the Commission determined that artificial segmentation of the written-message transmission industry would not be in the public interest. See id. at 506 ("We avoid making narrow definitions of individual offerings within that market because they could thwart innovation or confuse potential entrants.") (footnote omitted).
 
 
 69
 Moreover, although the PMS decision was made in response to an application, filed by Graphnet Systems, Inc. (hereinafter "Graphnet"), for authorization to compete with WUTC in the domestic transmission of international telegrams rather than telex, the FCC analysis of the need for competition was not limited to that narrow market. Instead, the FCC analyzed the entire public "record" (written) service market, that is, the transmission of messages in hard copy whether by telex or telegram or any other means. See PMS, 71 F.C.C.2d at 492-521. Ironically, given WUTC's arguments here on appeal, a thorough, in-depth analysis of the broad written-message transmission market was necessary in PMS in order to respond to the arguments WUTC made there.
 
 
 70
 The Commission's analysis of this broad market certainly was reasonable; there are no really discrete submarkets in this area. Even telex and telegrams compete for the same customers and are equivalent in many ways. Graphnet will deliver many telegrams to teletypewriters and other kinds of terminals and will be able to reach a million more such terminals than can WUTC. See id. at 527. Moreover, as the FCC pointed out in PMS, carriers use a common base of equipment to transmit either type of message; it would, therefore, be strange to decide whether more carriers should be allowed to enter the telegram submarket without considering whether they should be allowed to enter the telex market.
 
 
 71
 Finally, we note that, at the end of its analysis of the broad market for the transmission of written messages, the FCC concluded that "an open entry policy in the public record service (market) will benefit the public interest." Id. at 521. Thus, contrary to WUTC's contentions, the PMS finding on the need for competition is relevant to the use to which it was put in Gateways : increased competition between the IRCs and WUTC in the transmission of written messages, whether telex or telegrams, will be in the public interest.
 
 
 72
 b. The Merits of the PMS Decision
 
 
 73
 The remaining question is whether the FCC's decision that competition was needed in the entire written-message service market-was a reasonable one. In PMS, WUTC argued that telegraph service was unique and of great value to society but no longer profitable, and that its continued existence depended on the preservation of WUTC's domestic monopoly. See PMS, 71 F.C.C.2d at 492-501. In addition, as the Commission noted, see id. at 501, WUTC insisted that its monopoly should, in effect, be extended: in order to preserve domestic telegraph services, other carriers should not be allowed to offer profitable alternatives, such as telex or mailgram, because such carriers, unlike WUTC, would not use the revenues from such operations to subsidize domestic telegraph service. Id. Although WUTC has enjoyed a monopoly in the domestic PMS market ever since the 1940s, it has never been given a monopoly in the telex market. Indeed, its acquisition of TWX, a form of telex,[41] in the early 1970s was approved only because the FCC expected new competitors to enter the market.[42]
 
 
 74
 The Commission began its analysis by considering whether it was either necessary or desirable to extend WUTC's monopoly in order to attempt to preserve the ailing domestic telegraph industry in its traditional form. The FCC agreed that the industry was not healthy, but noted that WUTC, as a monopolist, had been able to control innovation. Indeed, reported the Commission, the only changes by WUTC over the years were cuts in service. Id. at 499. The FCC concluded that "(t)hirty-five years of monopoly have not produced a vigorous, publicly available record communications service. Rather, it has produced ever-increasing telegraph rates, diseconomic subsidies from more vigorous (WUTC) services, and increasing volume declines as the public finds and uses other services more closely tailored to its need." Id. at 510. The FCC was naturally reluctant to extend WUTC's monopoly in order to preserve a service with decreasing public demand during a time of great technological innovation in related services. Id. at 496-500.
 
 
 75
 The FCC concluded that WUTC's monopoly should not be extended, id. at 510-17, and, furthermore, determined that an end to WUTC's monopoly in the telegram service itself would be in the public interest, stating: "(W)e are concluding that there is not a vital public need for Western Union's PMTS today." Id. at 502. The FCC also noted, however, that WUTC's inability to make a profit in telegram service did not necessarily doom the efforts of others. Id. at 509-10. In reaching this decision, the FCC rejected WUTC's policy of cross-subsidies, noting that the policy certainly did not benefit consumers who used telex and were forced thereby to subsidize the telegram industry. Id. at 511-12, 517.
 
 
 76
 Finally, the FCC adopted an open entry policy for the entire written-message transmission industry, and held that the public interest would not be served by impeding new entrants in any way. Id. at 521. The FCC felt that this policy would maximize innovation, avoid artificial market segmentation, and provide the best environment for a healthier industry. See id. at 505-06, 509, 511, 521, 523-24. The Commission found that, based on its "cumulative knowledge of this industry and the record of this proceeding, there is sufficient ground to expect that the public will realize benefits by new entry." Id. at 524.
 
 
 77
 The FCC adopted this policy, rather than a more limited entry policy, with the full understanding that some entrants might fail. Id. at 521-22. The FCC determined that this danger did not necessitate a different policy because the Commission retained "adequate power" to deal with future problems in the area "to assure an efficient nation-wide, world-wide communications system at reasonable cost." Id. at 522.
 
 
 78
 When the FCC concluded in Gateways that IRC expansion would increase competition, it was building on the open entry policy initiated in PMS. Given this policy and the reasons for its adoption, the fact that WUTC could already offer telex services was not relevant to the authorization of additional providers. Nor was a city-by-city or carrier-by-carrier analysis necessary-the need for competition was found to exist in the industry as a whole. Indeed, the Commission had found that problems in the telecommunications industry were best handled by dealing with the structure of the industry, rather than with specific rates or other discrete areas or issues. See Gateways, 76 F.C.C.2d at 123-24; Preliminary Audit and Study of Operations of IRCs, 75 F.C.C.2d 726, 727 (1980). Carrier-by-carrier and city-by-city analysis was, of course, not necessary to ensure the economic viability of carriers serving expanded markets; when the FCC adopted the open entry policy, it was aware of this risk and indicated that it would handle problems as they arose.
 
 
 79
 Thus, the FCC did all that was required in Gateways and PMS : it reasonably concluded, with an adequate factual basis, that an open entry policy would be in the public interest. WUTC's only remaining objection is the claim that the FCC did not reach a reasonable determination that competition between the IRCs and WUTC would be feasible.
 
 B. The Feasibility of Competition
 
 80
 WUTC argues that the FCC acted unreasonably when it found that competition would be feasible.[43] In making this determination, however, the Commission undertook an exhaustive analysis of the impact expanded IRC operations would have on WUTC in the event IRC rates remained bundled and in the event they were unbundled. See Gateways, 76 F.C.C.2d at 137-46. The FCC determined that, if rates were unbundled, competition would be feasible between WUTC and IRCs. See id. at 142-45. Accordingly, the FCC required unbundling as a condition of the IRC's authorization to expand service.
 
 
 81
 WUTC also maintains that the FCC ignored the cost of additional, duplicate networks when it determined that competition would be feasible. The Commission indicated, however, that it would not authorize the construction of additional facilities. Instead, authorizations for additional IRC operations would be conditioned upon the lease of facilities from carriers with existing facilities. See id. at 145-46.
 
 
 82
 Thus, we consider the FCC's conclusions on the feasibility of competition reasonable. And, in sum, we find Gateways in its entirety both reasonable and consistent with section 222 of the Act, despite WUTC's myriad objections. We turn, at last, to TRT's objections to the Commission's Unbundling decision.
 
 IV. THE UNBUNDLING DECISION
 
 83
 TRT is the smallest of the four domestic IRCs and controls less than ten percent of the market.[44] TRT objects to the FCC's requirement that charges for terminals, local access lines to the IRC network, and message transmission be unbundled. The other IRCs, including the small foreign IRC, support the Commission's decision, although it is likely they would not agree to unbundle in the absence of the expansion authorization.
 
 
 84
 TRT raises two types of objections: that the FCC acted unreasonably in deciding that unbundled IRC rates would be in the public interest, and that the Unbundling decision should be reversed because of procedural errors. We consider these challenges seriatim.
 
 A. The Merits of Unbundled Rates
 
 85
 TRT makes several arguments against the reasonableness[45] of the Commission's Unbundling decision. First, TRT asserts that the primary effect of this decision is anti-competitive. TRT maintains that the predictable result is an increase in the rates paid by consumers and that competition within the industry can be expected to decrease. Indeed, TRT characterizes the FCC's decision as one in which the "FCC erred in mandating a rate increase." See Brief of Petitioner TRT at 18 (typeface modified). To explicate this point, TRT notes that, while the Gateways and Unbundling decisions were pending before the Commission, the other IRCs voluntarily filed rates offering customers a $.55 per transmission minute discount if they provided their own terminals and access lines into the IRCs' networks. TRT offered the same $.55 per minute discount to all its subscribers, regardless of whether they provided any equipment. After the Gateways and Unbundling decisions, however, TRT limited the discount to customers who provided their own terminals and access lines.
 
 
 86
 Contrary to TRT's assertion, the Commission did not "mandate" any increase in TRT's rate. TRT was free to continue to offer a $.55 discount over its previous rate to all customers. But it was required also to offer an unbundled rate, that is, to give customers willing to provide their own terminals and access lines an additional discount equal to the amount saved by TRT because it no longer supplied that equipment.
 
 
 87
 Thus, if the Commission's decision has had the effect of increasing rates, it is only because TRT responded by raising its rates and its overall rate of return rather than passing on to customers the amount it saves when they provide their own equipment and access lines. Indeed, the overall effect of unbundled rates, assuming carriers maintain their old rates of return, will be to reduce the cost of telex service to consumers and to increase competition in the terminal market. The transmission rate will be lower because it will no longer include terminal costs, and the amount spent on terminal and local access lines will decrease because consumers will not acquire terminals and lines they do not need. In addition, the decision will make it possible for terminal manufacturers and vendors to compete in the international telex equipment market.
 
 
 88
 As discussed above, bundled rates may have helped small IRCs compete with "the more extensive direct service networks" of the large IRCs. Brief of Petitioner TRT at 18. TRT argues that the Commission's Unbundling decision should be reversed because it will decrease competition. To make its point, TRT quotes from the Commission's decision in Gateways : " 'Therefore, the more complete the unbundling, the more difficult it becomes for the marginal carrier who offers essentially identical services at the same rate as the others to retain its market position.' " Brief of Petitioner TRT at 19 (quoting Gateways, 76 F.C.C.2d at 143).
 
 
 89
 Several points can be made in response to this argument. First, the small IRC in this situation is using forced subsidies from one group of its customers to another group[46] as a competitive edge in selling its product to those who would not pay its real cost. We think the FCC's rejection of such cross-subsidies a reasonable policy choice. See Unbundling, 76 F.C.C.2d at 78-79.
 
 
 90
 Second, as the FCC noted in unbundling, the objective of competition is to offer some real advantage to customers, not just to place terminals of a different company at locations where their benefits are less than their cost. See id. at 79. Indeed, this point is evident from the portion of Gateways quoted by TRT: unbundling makes it difficult for a marginal carrier to compete when it merely provides the same service at the same rate as others. If this is all TRT does, its "competition" appears to be of only marginal value. TRT is free to lower its unbundled rates and thus offer consumers a real benefit in order to maintain a competitive edge-and, indeed, it could do so and recover the same rate of return it realized under its initial rate filing, which gave a $.55 per minute discount to all its customers.
 
 
 91
 An additional, more serious flaw defeats TRT's argument: the Commission did not ignore the impact unbundling would have on TRT's competitive position. The Commission gave full consideration to these arguments, reasonably concluded that the problem was less serious than TRT imagines it, and imposed a second condition on the Gateways authorization to counteract any negative impact unbundled rates might have on TRT. The FCC ordered that the IRCs interconnect their networks upon demand in order to offset precisely this problem. Thus, a small IRC can now offer worldwide services.
 
 
 92
 TRT argues that interconnection cannot offset its disadvantage for two reasons: (1) the large IRCs will not act in good faith in interconnecting and will demand an excessive share of interconnection revenues; and (2) interconnection cannot help with the delivery of inbound messages. We find these arguments without merit. First, we note that TRT is not as dependent on interconnection as it would have us think. As the FCC pointed out in its Interface of the International Telex Service with the Domestic Telex and TWX Services, 77 F.C.C.2d 929, 932-33 (1980) (hereinafter "Denial of Stay "), TRT is smaller than most of its competitors in terms of volume of traffic handled, but it serves directly virtually every point served by other carriers. The only areas of any consequence that it did not serve directly at the time of the Commission's decision were Japan, Hawaii, and Guam. See Denial of Stay, 77 F.C.C.2d at 932-33.[47] Since then, TRT has interconnected with RCA to reach Japan, the only significant traffic stream it could not reach. Guam and Hawaii are under the FCC's jurisdiction, and TRT can serve them directly without the agreement of any foreign government. The FCC did not, therefore, act unreasonably in concluding that interconnection would preserve TRT's competitive position.[48]
 
 
 93
 In response to TRT's argument that interconnection cannot help a small IRC expand in the inbound market, we note, as did the FCC in Denial of Stay, 77 F.C.C.2d at 934, that bundled rates are equally unhelpful for that purpose. If an inbound message originates with a large IRC, that IRC is going to deliver the message rather than pass it on to any other carrier. Neither interconnection nor bundled rates have any bearing on the fact that an IRC cannot expect to deliver inbound messages originating with customers it does not serve.
 
 
 94
 TRT's final argument against the merits of Unbundling is that the Commission ignored the market conditions prevailing at that time. The large IRCs were already offering unbundled rates-a $.55 discount per minute to customers with their own terminal and access line-and there was, TRT asserts, no need to require a small carrier controlling less than ten percent of the market to unbundle its rates. If TRT means that the FCC should not have ordered any unbundling under these circumstances, the argument is clearly wrong. The voluntary adoption of a pending rule cannot make promulgation of the rule unreasonable. If it did, regulated entities would always be able to avoid the formal adoption of rules by voluntarily implementing them for a temporary period. Thus, the voluntary unbundling of the large IRCs' rates does not mean that the FCC erred in adopting an unbundling requirement.[49]
 
 
 95
 Perhaps, by this argument, TRT means that, at the time the FCC reached its decision, market conditions suggested that it was not necessary to make all carriers unbundle-that is, that the FCC should have adopted the unbundling requirement only for large carriers and allowed small carriers to bundle. As the FCC noted in Denial of Stay, 77 F.C.C.2d at 938-39, it ordered unbundling for reasons fully applicable to TRT despite its size. The FCC determined that, as a policy matter, the cross-subsidies between consumer groups inherent in bundled rates were undesirable and should end. Id. at 938. In addition, the FCC wanted to ensure that WUTC, whose rates were unbundled, could compete with IRCs on a fair basis. The service at issue here is fungible;[50] TRT can now send messages all over the world through interconnection and, unlike WUTC, is able to offer direct service to most foreign points. Under these conditions, TRT's size will afford WUTC little protection if TRT is given an unfair competitive advantage. Id. at 939.
 
 B. Procedure
 
 96
 TRT raises three procedural objections to the Unbundling decision: (1) the FCC failed to find that existing rates were unfair; (2) an evidentiary hearing should have been held; and (3) the FCC lacked the authority to impose unbundling as a condition to a service authorization rather than in a ratemaking proceeding.
 
 
 97
 On the first point, TRT argues that the FCC erred in ordering unbundled rates without the requisite finding that existing rates were unfair. We disagree. In Unbundling, the FCC clearly indicated that current rates were unfair to the precise extent necessary to support its order-to the extent they were bundled. See Unbundling, 76 F.C.C.2d at 77-81; see especially id. at 79 ("If the IRCs are recovering their terminal costs overall, and some of those terminals are inefficiently used, it follows that at least for some customers the usage charges are too high."); see also Denial of Stay, 77 F.C.C.2d at 937-38.
 
 
 98
 Next, TRT maintains that the FCC should have held an evidentiary hearing before ordering unbundling. TRT bases this argument on section 205(a) of the Act, which authorizes the FCC to proscribe old rates and prescribe new ones only "after full opportunity for hearing." Act § 205(a), 47 U.S.C. § 205(a) (1976). In Unbundling and Gateways, the Commission was not engaged in ratemaking, however, but in making policy. It is settled law that FCC policy decisions impacting, but not setting, rates may, when appropriate, be made in an informal rulemaking rather than in an adjudicatory ratemaking proceeding. For example, in AT&T v. FCC, 572 F.2d 17, 21-23 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), the court upheld an FCC decision declaring rates illegal without an evidentiary hearing. In that case, the court noted that "after a hearing" in section 205(a) of the Act means after the type of hearing appropriate in the particular case: "It is incontrovertible that both the purpose and effect of the challenged proceedings was (sic ) to establish FCC policy with respect to the resale and sharing of private line services. Therefore, it is apparent that the FCC was acting in a rule-making rather than an adjudicatory capacity." Id. at 22.
 
 
 99
 TRT asserts that an evidentiary hearing was needed for an additional reason-to resolve the dispute about the economic impact of the decision. This argument was also made in AT&T ; as the Second Circuit noted in its decision, however, this is not the type of issue that requires an evidentiary hearing. Id. at 22-23. If it were, few policy decisions by regulatory agencies could ever be made without a full adjudicatory hearing.[51]
 
 
 100
 TRT's final procedural objection is that the FCC acted illegally in making unbundling a condition to the expansion authorized by Gateways. TRT argues that ordering the "wholesale abrogation of a carrier's lawful rate structure is not the sort of rate condition that the courts have authorized when an agency grants new authority to regulated enterprises." Brief of Petitioner TRT at 38. Such a condition in an authorization for new services is only permissible on a temporary basis-when necessary to " 'hold the line awaiting adjudication of a just and reasonable rate.' " Id. at 39 (quoting Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 392, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959)). TRT goes on to characterize subsequent cases as "confirm(ing) that a departure from the normal ratemaking provisions is permissible only on a temporary basis until the full procedures of the statute can be followed." Id. at 39.
 
 
 101
 The condition imposed by Gateways did not, however, set or demand any particular rate, nor did it mandate the "wholesale abrogation" of any carrier's lawful rate structure. Indeed, carriers were free to continue to charge their old rates. They were only required to file an additional rate for customers with their own terminals and access lines. The precise rate was not even temporarily determined by the Commission in Gateways.
 
 
 102
 Moreover, the cases cited by TRT, such as Atlantic Refining Co., involve authorizations conditioned on rate changes, not rate-structure changes. In the past, courts have not objected to rate-structure conditions in authorizations. See United States v. FCC, 652 F.2d 72 (D.C.Cir.1980) (en banc) (grant of satellite authorization conditioned on forbearance from offering "packaged end-to-end data communications services"); Network Project v. FCC, 511 F.2d 786 (D.C.Cir.1975) (satellite authorizations to equipment suppliers conditioned on separation of service offering from equipment sales). We conclude, therefore, that the FCC's rulemaking was not violated by the choice of an inappropriate procedural route.
 
 CONCLUSION
 
 103
 In Gateways, the FCC determined that the IRCs are not barred from domestic operations by section 222 of the Act and that competition between the IRCs and WUTC will be in the public interest. The Commission therefore authorized IRC expansion into twenty-one domestic points of operation, provided two conditions are met: the IRCs must unbundle their rates and interconnect their networks upon demand. These changes were found to be in the public interest in Unbundling, the other decision challenged in this appeal. Because we find both decisions reasonable and within the scope of the FCC's statutory authority, we uphold the Commission's actions.
 
 
 104
 It is so ordered.
 
 
 
 [1]
 There are three large domestic IRCs: ITT World Communications, Inc. (ITT), RCA Global Communications, Inc. (RCA), and Western Union International, Inc. (WUI). These carriers control 90% of the market. TRT Telecommunications Corporation (TRT) is a small domestic carrier. The fifth carrier, FTC Communications, Inc., is foreign-owned and provides service basically limited to the United Kingdom and France
 
 
 [2]
 See International Record Carriers' Scope of Operations in the Continental United States, 76 F.C.C.2d 115 (1980) (hereinafter "Gateways ")
 
 
 [3]
 See Interface of the International Telex Service with the Domestic Telex and TWX Services, 76 F.C.C.2d 61 (1980) (hereinafter "Unbundling ")
 
 
 [4]
 The Defense Communications Board was created by President Roosevelt in September, 1940. See Exec. Order No. 8546, 5 Fed.Reg. 3817 (1940). It was renamed the Board of War Communications in 1942. The Chairman of the FCC was the Board's ex officio Chairman
 
 
 [5]
 The IRCs used high-frequency point-to-point radio transmitters and receivers to send messages between points within the United States. Most of WUTC's domestic transmissions were carried by cables or telegraph lines, also referred to as "land lines."
 
 
 [6]
 See Board Orders Nos. 8 & 8A, 7 Fed.Reg. 4183 & 5089 (1942). At the time of the Board's action, 16 radio carriers, including RCA and Mackay Radio and Telegraph Co. (hereinafter "Mackay Radio") (a predecessor of ITT) were providing domestic telegraph service by means of these circuits, in competition with the essentially land-line facilities of Western Union and Postal Telegraph. See FCC, Seventh Annual Report for Year Ending June 30, 1941, at 17 (1941)
 
 
 [7]
 The Act does not state that a merged domestic carrier is barred forever from international operations. It merely says that "(a)ny proposed consolidation or merger ... shall provide for divestment ... within a reasonable time." Act § 222(c)(2), 47 U.S.C. § 222(c)(2) (1976). Thus, it is conceivable that the statute could have been interpreted as permitting FCC authorization of international operations by a merged domestic carrier-provided the carrier had divested itself of those international operations carried on at the time of the merger. The Second Circuit has, however, held on two occasions that § 222(c)(2) prohibits WUTC "from engaging at any time in 'international telegraph operations' as defined in the Act and must confine itself to 'domestic telegraph operations.' " ITT World Communications, Inc. v. FCC, 635 F.2d 32, 40 (2d Cir. 1980); see also Western Union International, Inc. v. FCC, 544 F.2d 87 (2d Cir. 1976), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977)
 
 
 [8]
 The IRCs were unable to resume their point-to-point radio-telegraph transmissions after the war because the frequencies they had used were no longer available. See text at note 35 infra
 
 
 [9]
 These cities were San Francisco, Washington, D.C., Miami, New Orleans, and New York
 
 
 [10]
 Telex and TWX services are functionally equivalent, and "telex" is used in this opinion to refer to any two-way communication capability between teletypewriters, including TWX service. TWX is the form of telex originally developed by AT&T, and it exists only in the United States and Canada
 
 
 [11]
 Approximately 50,000 telegram users a month bypass WUTC's "hinterland" facilities at their own expense in order to file overseas messages directly with the IRCs. RCA reports that its "hinterland" customers paid an average of $125 per month for the private access line needed to reach RCA's network. See Brief of Intervenor RCA at 19
 
 
 [12]
 The IRCs offered a free manual keyboard teleprinter and free local access line into the IRC network to any customer generating $120 per year in revenues. For an additional $10 per month, a customer generating $900 per year in revenues could obtain an automatic keyboard teleprinter and access line. At that time, message rates ranged from $2 to $3 per transmission minute. Thus, the usage requirement was satisfied if the user sent roughly 16 three-minute messages a year on a manual teleprinter or 120 three-minute messages on the automatic machine. See Gateways, 76 F.C.C.2d at 137-38
 At the time these rates were available, terminals cost $60 to $120 per month, with some of the latest models as high as $180 per month. See id. at 143. The cost of a local access line into the IRC network depended on the distance involved, because this was a leased telephone line. Because customers outside the gateways sent messages to the IRC at their own expense, the IRCs' bundled rates included only terminals and local access lines for customers within the gateways. These access lines were, of course, fairly inexpensive because they were not long distance.
 
 
 [13]
 International telex messages, like telegrams, were transmitted at postalized, country-by-country rates. Under this structure, the same rate was paid by WUTC customers regardless of their location and by IRC customers in the gateway cities. When a message originated or terminated with WUTC, the IRC absorbed the domestic telex charge. See Gateways, 76 F.C.C.2d at 138 n.16
 
 
 [14]
 See note 12 supra
 
 
 [15]
 It is unlikely that bundled rates gave large IRCs any significant advantage over each other. To some extent, such rates may have made it marginally easier for IRC 2 to convince a customer of IRC 1 to acquire one of IRC 2's terminals in order to have a second direct link to an area. The customer would then be able to use IRC 2's channels when those of IRC 1 were busy. But IRC 1 would be able to do the same thing with IRC 2's customers, netting out any competitive advantage
 
 
 [16]
 The Commission reports that bundling "apparently originated when international Telex was a developing service in which RCA had gotten a head start." Brief of Respondent FCC at 11. Despite some "misgivings" about bundled rates, the Commission "allowed Mackay Radio and Telegraph Co., a predecessor of ITT, to file Telex tariffs offering terminals at minimal charge." Id. In response, all the IRCs filed "bundled" rates. Id
 
 
 [17]
 See note 1 supra
 
 
 [18]
 The Commission also authorized two additional forms of IRC expansion in Gateways. The FCC approved the establishment of gateways at four satellite transmission stations. See Gateways, 76 F.C.C.2d at 146-48. And the FCC approved expansion of the geographical areas included in the current gateways. See id. at 148-49. These authorizations are not challenged in this action
 
 
 [19]
 In December of 1980, Congress adopted Pub.L.No.96-590, 94 Stat. 3414, which amended the definition of continental United States in § 222(a)(10) to include the state of Hawaii. Hawaii had previously been an "international" point under that section. See 126 CONG. REC. H12,396 (Dec. 12, 1980). This law also added a new subsection 222(g)(1) to the Act, which ensured that no existing carrier would be barred from offering services to Hawaii solely as the result of the bill's passage
 This amendment has no impact on the legality of IRC hinterland operations. In 1977, when the Senate Committee on Commerce, Science, and Transportation first reported on the Hawaii amendment, then styled S. 1866, it stated:
 The committee is aware of the current debate over whether section 222 bars the IRC's entry into the domestic market in the hinterland. The committee wishes to indicate that the rights of the IRC's in Hawaii to Mainland service under the new subsection (g)(1) should not be presumed to reflect new Congressional views on the IRC's authority to provide service directly to the hinterland. subsection (sic) (g)(1) is merely intended to assure continuity in service now being provided by the IRCs between Hawaii and the gateway cities. Section (g) (1) would insure that the ownership and operation of the three submarine cables between Hawaii and the mainland by the IRC's ATT and their foreign correspondents will not be disturbed merely by virtue of enactment of this bill.
 S.Rep.No. 389, 95th Cong., 1st Sess. 6 (1977).
 
 
 [20]
 Section 222(a)(3) defines an "international telegraph carrier" as "any common carrier by wire or radio, the major portion of whose traffic and revenues is derived from international telegraph operations; and such term includes a corporation owning or controlling any such common carrier." Act § 222(a)(3), 47 U.S.C. § 222(a)(3) (1976)
 
 
 [21]
 This is the cardinal rule of statutory construction. See United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961); Ex parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949). See also ITT World Communications, Inc. v. FCC, 595 F.2d 897 (2d Cir. 1979). In Itt, the Second Circuit noted that "the immediate concern of Congress (in passing § 222) was to permit the merger of the financially ailing Postal Telegraph Co., a domestic carrier, into Western Union Telegraph Co." Id. at 905. The court continued: "Since the IRCs sought no such monopoly but remained in vigorous competition with each other, a(n) ... extensive invocation of legislative history ... would be required to justify a reading of the statute that would bar the IRCs from domestic telegraph operations outside the designated gateways as a matter of law." Id. at 907-08
 
 
 [22]
 The overlapping definitions were the result of the 1942 changes to the White-McFarland proposal made by the Senate Committee, see text and note at note 27 infra. The Committee report explains that it made one major change (deleting the provision regarding voluntary merger of international carriers) and states that "(m)ost of these (other) changes were refinements in language and clarification of the objective sought." S.Rep.No. 1490, 77th Cong., 2d Sess. 8 (1942). In the section-by-section analysis, the definitional subsection (then (g)) was described as "defin(ing) the terms used in the bill." Id. at 10
 There is one clue in the Committee report suggesting a possible reason for the overlapping definitions. The report includes a statement made by Senator McFarland when he presented the original bill in 1942. In this statement, Senator McFarland quoted the recommendation of the 1941 Senate report, which had not accompanied any specific bill, S.Rep.No. 769, 77th Cong., 1st Sess. 25-26 (1941) (titled Study of the Telegraph Industry ). See 88 Cong.Rec. 3414-15 (1942), quoted in S.Rep.No. 1490, 77th Cong.,2d Sess. 4-5 (1942). Although the 1942 bill contained definitions of "domestic operations" and "international operations" which did not overlap, Senator McFarland quoted this portion of the earlier recommendation:
 The legislation should define "domestic" and "international" carriers and shall not prevent the inclusion of all existing operations of any domestic carrier, which may be engaged partially in international telegraph communications, into a merged domestic enterprise, and shall empower the Federal Communications Commission eventually to require the merged domestic carrier to restrict itself solely to domestic telegraph operations if found to be in the public interest.
 
 
 [88]
 Cong.Rec. 3414 (1942) (quoting S.Rep.No. 769, 77th Cong., 1st Sess. 25 (1941)
 Perhaps it was thought necessary to define domestic operations broadly in order to ensure that WUTC, which had substantial international operations, would nevertheless be a "domestic carrier" and thus qualified to merge and, in addition, to continue international operations until such time as divestment could be arranged. It appears that this was not in fact necessary-the definition of a domestic carrier was (and is) a carrier that derives a major portion-not necessarily all-of its revenues from domestic telegraph operations. Thus, as long as most of WUTC's traffic and revenues came from domestic operations, it would have had no difficulty in meeting either qualification.
 RCA and the Commission suggest that the proviso was designed to limit the FCC's discretion in implementing any merger. For a discussion of this point, see note 27 infra.
 
 
 [23]
 In contexts other than discussion of the statutory definitions, this opinion will use "domestic" to refer to operations transmitting messages within the United States, and "international" to refer to operations transmitting messages between points in the United States and points abroad. This usage, though inconsistent with § 222's definitions, is consonant with the use of these terms by the parties and the industry
 
 
 [24]
 Postal had been reorganized in bankruptcy in 1940, thereby ending its long-time ownership by International Telephone & Telegraph Corporation. See S.Rep.No. 769, 77th Cong., 1st Sess. 17 (1941). Even so, Postal was kept afloat only by loans from the government's Reconstruction Finance Corporation. See id. at 20
 
 
 [25]
 Spokesmen for the principal IRCs, including RCA Globcom, also supported permissive merger legislation, but opposed abandonment of their domestic radio-telegraph business unless a merger of international carriers, as well as a domestic merger, was accomplished. See S.Rep.No. 769, 77th Cong., 1st Sess. 6-7 (1941)
 
 
 [26]
 S. 2445 included, as proposed subsections (c) and (d) of a new § 222, the following provisions:
 (c)(1) As a part of any consolidation and merger, the consolidated domestic telegraph carrier may, after hearing, and with the approval of the Commission, take over all or any part of the domestic telegraph operations of any international telegraph carrier.
 (2) Any proposed consolidation and merger of domestic telegraph carriers shall provide for the divestment by the consolidated domestic telegraph carriers of the international telegraph operations theretofore carried on by any party to the consolidation and merger, and the Commission shall require, either at the time of the approval of such consolidation and merger or within such reasonable time as it may thereafter specify, that such consolidated carrier completely divest itself of all such international telegraph operations.
 (d)(1) As a part of any consolidation and merger, a consolidated international telegraph carrier may, after hearing, and with the approval of the Commission, take over all or any part of the international telegraph operations of any domestic telegraph carrier.
 (2) If a proposed consolidation and merger of international telegraph carriers fails to provide for the divestment by the consolidated international carrier of the domestic telegraph operations theretofore carried on by any party to the consolidation and merger, the Commission shall require either at the time of the approval of such consolidation and merger or within such reasonable time as it may thereafter specify that such consolidated carrier completely divest itself of all such domestic operations.
 S.2445, 77th Cong., 2d Sess. § 222 (1942) (emphasis added).
 The measure also included, among several defined terms, the following:
 (5) The term "domestic telegraph operations" includes acceptance, transmission, reception, and delivery of record communications by wire or radio which both originate and terminate at points within the continental United States.
 (6) The term "international telegraph operations" includes acceptance, transmission, reception, and delivery of record communications by wire or radio which either originate or terminate at points outside the continental United States.
 Id.
 Under these definitions, a merged IRC would have retained an unlimited right to pick up and deliver overseas traffic anywhere in the country, even after it had divested itself of its domestic operations. In contrast, WUTC's interpretation of the proviso would bar not only domestic operations by "unmerged" IRCs, but also their transmission of the "land-line" haul of messages bound for, or originating from, foreign ports.
 
 
 [27]
 In particular, S. 2598 included, in a proposed § 222(g)(5), the all-inclusive definition of domestic telegraph operations and the gateways proviso eventually enacted in § 222(a)(5). The previous bill had defined domestic and international operations as distinct and did not include the proviso. See note 15 supra. For a suggestion as to why S. 2598's new definition of "domestic" operations may have included "international" operations, see note 22 supra. The proviso may have been seen as helpful in clarifying the limited effect of the all-inclusive definition of domestic operations
 RCA and the Commission suggest that the proviso may have been enacted to limit the FCC's ability to restrict IRC activities following a merger. Brief of Respondent FCC at 39 n.55; Brief of Intervenor RCA at 8. The Commission reports that the IRCs suggested the proviso "to protect them against the Commission" because "(t)he fear was that the Commission might exercise its discretion to implement Section 222 in a way that would curtail the IRCs' activities even in the gateways. Without the proviso, nothing would have forbidden that." Id. See also Gateways, 76 F.C.C.2d at 129.
 If the proviso was designed to limit the discretion of the Commission in authorizing services under § 214 of the Act, it is poorly drafted. It does not expressly limit the Commission's authority any more than it limits IRC activities. It merely states that "nothing in this section (§ 222) shall prevent" the pickup and delivery of international messages by IRCs in gateway cities.
 
 
 [28]
 See text and notes at notes 4 & 6 supra
 
 
 [29]
 The House bill continued to bear the designation "S.2598," but the House Committee had amended the Senate version by striking everything after the enacting clause and substituting its own proposals. The relevant House print is identified as "Union Calendar No. 963."
 
 
 [30]
 This version also retained the Senate designation "S. 158," though the text of the Senate bill had been replaced by the text of the House bill. The House print is "Union Calendar No. 9."
 
 
 [31]
 The Committee explained that the proviso was unnecessary with these words:
 Since the committee substitute contains no provisions requiring divestment of telegraph operations of any kind, and contains no provisions that would prevent international companies from carrying on the operations referred to in the above proviso, the proviso has been omitted as unnecessary.
 H.R.Rep.No.69, 78th Cong., 1st Sess. 6 (1943) (emphasis added). WUTC argues that the proviso was seen as unnecessary at this point only because the House bill did not include any divestiture requirement. WUTC ignores, however, the italicized language. Two reasons are given for eliminating the proviso: the fact the bill had no divestiture requirement for any carrier and the fact that it contained no limit on IRC operations. When the provision was reinserted at conference, it was seen as a clarification, not a substantive change. See text and notes at notes 32-33 infra.
 
 
 [32]
 See H.R.Rep.No.142, 78th Cong., 1st Sess. 10 (1943):
 This proviso is the same as the one contained in the definition in the Senate bill except that the words "under regulations prescribed by the Commission" have been inserted. It was felt desirable to include this proviso, in order clearly to permit carriers to continue the operations referred to, because of the requirement (in subsection (c)(2)) that in case of a consolidation or merger of domestic telegraph companies the plan of consolidation or merger shall provide for the divestment of the international telegraph operations theretofore carried on by any party to the consolidation or merger.
 
 
 [33]
 See 89 Cong.Rec. 1092 (1943):
 The House conferees also accepted a Senate proviso in one definition to make clear that international communications' (sic ) companies may continue to operate offices in certain gateway cities in the United States.
 
 
 [34]
 Certified copies of the letters exchanged between RCA, Chairman Fly, and Chairman Jett are in the files of the Board of War Communications in the National Archives. The letters are reprinted as Appendix C of Brief of Intervenor RCA
 
 
 [35]
 WUTC argues that, at the time it was passed, the FCC thought the proviso barred domestic IRC operations. WUTC bases this argument on a statement made by the FCC in its consideration of WUTC's merger application:
 It has long been recognized that in many fields, competition normally provides assurance for the best service at the lowest possible cost to the public. The history of the domestic telegraph industry, however, indicates that competition between Western Union and Postal has not had the expected and desired effects. Competitive practices have resulted in useless paralleling of facilities, duplication of operations, and wasteful expenditures of resources and manpower. Such competition has, in a large measure, been responsible for the unsatisfactory financial condition in which both Postal and Western Union have found themselves during the course of the last decade or more. Moreover, telegraph service appears to fall within the field of "natural monopolies," such as the telephone, power and gas distribution utilities, where it has usually been found by experience that one company adequately regulated can be expected to render a superior service at lower cost than that provided by competing companies.
 Application for Merger of the Western Union Telegraph Co. and Postal Telegraph, Inc., 10 F.C.C. 148, 162 (1943) (emphasis added). This statement does not indicate that § 222 bars competition from the IRCs, however. It merely states the obvious: the FCC approved the merger because continued competition between WUTC and Postal was seen as too costly.
 
 
 [36]
 In its brief, the Commission itself notes that "(s)ince the early 1970s, the Commission generally had regarded the IRCs as 'prohibited by the proviso to § 222(a)(5) of the Act, or by emanations from it, from engaging in domestic telegraph operations except by accepting and delivering messages at gateway cities approved by the FCC.' " Brief of the FCC at 31-32. (quoting ITT World Communications, Inc. v. FCC, 595 F.2d 897, 900 (2d Cir. 1979) (omitting footnote)). In ITT World, the Second Circuit provided the impetus for the FCC's recent reexamination of the scope of § 222 by suggesting that the generally accepted domestic-international dichotomy might not be mandated by the statute. See ITT World, 595 F.2d at 904-09
 
 
 [37]
 WUTC also maintains that the FCC erred in failing to establish just and reasonable IRC rates so that fair competition between the IRCs and WUTC would be possible. WUTC makes two basic arguments here: (1) the IRCs enjoy unreasonably high rates of return on their international transmissions and will use these revenues to subsidize their expanded operations within the United States, and (2) the IRCs' unbundled tariffs discriminate unfairly against WUTC customers. On the first point, the Commission has addressed the IRCs' rates of return in another proceeding not involved in this appeal. See Preliminary Audit and Study of Operations of IRCs, 75 F.C.C.2d (1980), 59 F.C.C.2d 240 (1976), review pending sub. nom. Western Union Tel. Co. v. FCC, No. 79-2497 (D.C.Cir., filed Dec. 14, 1979)
 On the second point, WUTC argues that the IRC rate structure is unfair because, as exemplified by ITT's rates, WUTC customers will not receive the $.55 discount available to ITT customers providing their own access to an ITT domestic point of operation. According to WUTC, "(o)bviously this puts Western Union in an impossible competitive position with respect to the domestic handling of international traffic." Brief of Petitioner WUTC at 44.
 This argument is, to say the least, misleading. In the first place, the propriety of ITT's discount structure is not at issue in this case. As WUTC knows, it was a question before the FCC in ITT World Communications, Inc., 79 F.C.C.2d 173 (1980), though that decision is not even cited by WUTC in its description of the problem. There, WUTC made this same argument, and the Commission rejected it for excellent reasons completely obfuscated by WUTC in its statement to this court. The $.55 discount is available to any customer providing his own access into ITT's network. Actually, WUTC is seeking a continuation of the previous pricing structure under which IRC customers subsidized the land-line haul of WUTC customers' international messages. Under that arrangement, a WUTC hinterland customer paid the same postalized country-to-country rate paid by IRC customers who either were hooked directly into the IRC network in a gateway city or paid additional charges for a leased line between the hinterland and the gateway. As the Commission noted in Gateways, this structure forced IRC customers to subsidize the land-line haul cost of WUTC customers. See Gateways, 76 F.C.C.2d at 138 n.17. For additional reasons for the FCC's disapproval of this pricing structure, see ITT World Communications, Inc., 79 F.C.C.2d at 181-82.
 
 
 [38]
 WUTC explicitly states-somewhat ungrammatically-that the British Post Office data "shows that the service quality on the Western Union system is as good or better as that on the IRCs' system." Brief of Petitioner WUTC at 34. Yet the only data WUTC cites describe call-completion rates
 WUTC also states that the Commission "notes" that RCA's claim of better service "is contradicted by objective data provided by a disinterested party, the British Post Office." Brief for Petitioner WUTC at 34 (citing Gateways, 76 F.C.C.2d at 139 n.18). The Commission "notes" no such thing; it merely reports that "Western Union's reply comments argued that the IRC evidence is misleading and presented its own evidence to show that service quality is not inferior to that of the IRCs." Gateways, 76 F.C.C.2d at 139 n.18.
 
 
 [39]
 We find WUTC's argument on this point disingenuous. It is made for the first time in the reply brief. See Reply Brief of Petitioner WUTC at 22. Moreover, as noted in text, WUTC's arguments against domestic PMS competition necessitated review of the entire written message transmission industry in the PMS decision
 
 
 [40]
 See Application to Participate in the Hinterland Delivery of International Communications Messages, 67 F.C.C.2d 1059, 1065 n.6 (1978) (notice of proposed rulemaking in PMS decision) (hereinafter "PMS NPRM "):
 Public message telegraph service is ordinary telegram service, in which the carrier ... accepts written or oral messages at a public office or via the public telephone network, transmits those messages to its public office in another city, and delivers the messages either in written or oral form to the designated recipient. No customer terminal equipment is required. Unlike the customer who uses public long distance telephone service, the telegram customer does not subscribe in advance to any service and get his premises connected to the network. Graphnet Systems, Inc., 64 F.C.C.2d 1023 (1977).
 It is true that this narrow definition of PMS appears in the notice of proposed rulemaking in PMS. In its reply brief, WUTC argues that the "notice instituting the PMS proceeding made clear that terminal-to-terminal services (such as telex) were not under consideration." See Reply Brief of Petitioner WUTC at 22 (citing PMS NPRM, 67 F.C.C.2d at 1065 n.6). Regardless of the definition of PMS used in the notice, however, the PMS decision was not limited in scope to the traditional PMS market.
 Perhaps WUTC means to assert that the scope of the PMS inquiry was impermissibly broader than the notice. But since a broad inquiry was necessary to respond to WUTC's challenges in PMS, WUTC is in no position to make that objection.
 
 
 [41]
 See note 10 supra
 
 
 [42]
 See Western Union Telegraph Co., 24 F.C.C.2d 664 (1970)
 
 
 [43]
 WUTC also characterizes the Commission's determination that competition would be feasible as unreasonable because the FCC did not conduct carrier-by-carrier and city-by-city analysis. Our response to this point in the feasibility context is no different than it was when the argument was made in challenging the merits of the PMS determination. See discussion in Part III (A)(2)(b) supra
 
 
 [44]
 See note 1 supra
 
 
 [45]
 Actually, TRT argues that the FCC's conclusions in the Unbundling decision are not supported by "substantial evidence." See Brief of Petitioner TRT at 32. This standard is not, however, appropriate in reviewing an informal rulemaking proceeding under § 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976). Because the Unbundling decision was the result of such a procedure, see text at note 52 infra, the appropriate standard of review is not "substantial evidence" under id. § 10(e)(2)(E), 5 U.S.C. § 706(2)(E) (applicable to formal rulemaking or adjudicatory proceedings, both of which include hearings), but rather "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under id. § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (applicable to informal rulemaking proceedings, which do not require formal hearings)
 
 
 [46]
 There are two relevant groups of consumers. The first would use TRT's services even under unbundled rates because it receives benefits equal to the real cost of the services-such as direct access to an area not served directly by some other IRC or faster, more reliable service (because TRT's lines are not as busy) to an area served directly by both TRT and other IRCs. The second class uses TRT only because rates are bundled but will not do so if the real cost of the terminal and access line is imposed on them. Both groups pay the same rate per transmission minute, a rate which includes the costs of the diseconomic terminals and access lines. If rates were unbundled, the cost of TRT's services to the second group would be too high, and these consumers would stop using TRT. The rates charged the first class would be reduced because it would no longer be paying for unneeded equipment
 
 
 [47]
 At the time of the Commission's order, the only other points served by American IRCs, but not by TRT, were Andorra, Benin, Djibouti, Monaco, American Samoa, and Western Samoa. In 1978, the most recent year for which figures were available to the Commission, these points represented only 2/100 of one percent of total United States telex minutes, and 37/1000 of one percent of total revenues. See Denial of Stay, 77 F.C.C.2d at 932 n.4
 
 
 [48]
 TRT asserts that the IRCs will not interconnect with it in good faith, but will instead delay as much as possible and demand an exorbitant share of the revenue. This challenge is premature. If the IRCs do not interconnect with TRT upon demand, or if they set unreasonable terms, TRT is free to make these arguments before the Commission at the appropriate time
 
 
 [49]
 Furthermore, in the case at bar, the FCC had been investigating the lawfulness of bundled rates for thirty months prior to the voluntary filing of unbundled rates. Initially, all but one of the IRCs opposed unbundling. See Unbundling, 76 F.C.C.2d at 80. When TRT offered the $.55 discount to all its customers rather than voluntarily unbundling like the other IRCs, ITT and RCA stated that "they would be compelled, out of competitive necessity, to match that TRT 'rebundled' rate unless the Commission acted quickly to require TRT to adopt a true unbundled rate structure." Brief of Intervenor ITT at 6. It was therefore likely that, if the Commission had not promulgated a rule mandating unbundling, the IRCs would have promptly rescinded their unbundled rates. Failure to adopt the rule under these circumstances would have been a waste of administrative resources
 
 
 [50]
 As TRT acknowledged in an affidavit accompanying its petition to the FCC for a stay of the Unbundling and Gateways decisions, international telex service is basically a fungible commodity. See Declaration of Richard Yalem at 6 (Mar. 5, 1980) (accompanying Petition of TRT for Stay), reprinted in J.A. at 556, 561. Thus, users will naturally gravitate to the carrier offering the "best deal" regardless of its size. The only advantage a large carrier has is the ability to offer direct service to more foreign locales; customers prefer such service because it is faster and the connection is of better quality
 
 
 [51]
 TRT cites three cases to support the proposition that this case involves an area in which courts often insist on rigorous evidentiary proceedings. None of the cited cases is on point. The first case cited, Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1258 (D.C.Cir.1973), deals with actual ratemaking. Here, the FCC did not order any specific rate; carriers were required merely to file an additional rate for customers providing their own access line and terminal
 National Air Carrier Ass'n v. CAB, 436 F.2d 185, 195 (D.C.Cir.1970), is cited to support the proposition that this court often requires evidentiary hearings in cases involving competition. That case holds that such hearings are especially appropriate in decisions involving agreements against which serious allegations of antitrust violations are made. No antitrust violations are alleged here. Indeed, bundled rates, rather than unbundled rates, would be more likely to violate the antitrust laws: refusing to sell one product to anyone who does not buy a second product-product "tying"-is frequently impermissible.
 In TRT's third case, the court states only that it would be remiss to allow the FCC to implement a program with a major effect on rates without considering economic impact. See North Carolina Utilities Comm. v. FCC, 552 F.2d 1036, 1055 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). We agree with this general proposition, but the FCC has given extensive consideration to the economic consequences of the decisions before us here, though not in the format of an adjudicatory hearing.